828 So.2d 587 (2002)
Frank Baist ALLAIN, et al.
v.
MARTCO PARTNERSHIP.
No. 2001 CA 0614.
Court of Appeal of Louisiana, First Circuit.
April 17, 2002.
Rehearing Denied May 29, 2002.
*590 James H. Dupont, William C. Dupont, Plaquemine, for Plaintiffs/Appellants, Frank Baist Allain, et al.
James P. Dore, Amy D. Berret, Baton Rouge, for Defendant/Appellee, Martco Partnership.
Before: CARTER, C.J., PARRO, and CLAIBORNE,[1] JJ.
CARTER, C.J.
This suit arises from a dispute between plaintiffs,[2] who co-own 17.5% of 9,617 acres of timberland in Iberville and West Baton Rouge Parishes, and the co-owners of the remaining 82.5% ("majority owners"). Martco Partnership (Martco) entered into a sale with the majority owners pursuant to LSA-R.S. 3:4278.2,[3] which permits the sale of timber with the consent of co-owners representing at least 80% ownership interest in the land. Because plaintiffs refused to participate in the sale, their *591 portion of the sale price was deposited into the registry of the court in accordance with LSA-R.S. 3:4278.2D.
Plaintiffs filed suit against Martco to annul the sale. Plaintiffs contend that the sale is invalid for three reasons: 1) the consideration for the sale was so inadequate as to constitute lesion beyond moiety;[4] 2) Martco did not strictly comply with the provisions of LSA-R.S. 3:4278.2; and 3) LSA-R.S. 3:4278.2 is unconstitutional.[5] After a bench trial, the trial court rejected each of these claims and rendered judgment in favor of Martco. Plaintiffs appeal.

WAS THE PRICE MARTCO PAID FOR THE TIMBER LESIONARY?
Plaintiffs contend that the price Martco paid for the timber, $2,490,750.18, on 9,617 acres,[6] was less than half the fair market value and thus the sale is subject to rescission for lesion beyond moiety under LSA-C.C. art. 2589.[7] The trial court found specifically "as a matter of fact and based upon the evidence adduced at trial that the price paid for the timber purchased was in excess of 50% of the value of said timber."
Three foresters "cruised" this propertySteven L. Busby for plaintiffs, Jewel L. Willis for the majority owners, and Donald J. Gremillion for Martco. A timber cruise is a systematic sample conducted on a tract of timber to determine the species and grade of timber on the property. From a cruise, a forester can calculate "stumpage" (the value of the standing timber) by determining the board feet of saw timber and the number of cords of pulpwood that can be harvested from the tract.[8] Busby estimated the stumpage value at $5,179,354.01, based on 8,608,998 board feet of saw timber and 10,869 cords of pulpwood. Willis calculated a slightly smaller amount, 8,075,866 board feet of saw timber and 10,091 cords of pulpwood, while Gremillion reached a much smaller figure when he cruised for Martco4,843,993 board feet of saw timber and 5,188 cords of pulpwood. The smaller volume of Gremillion's cruise calculations accounted *592 for a much lower estimate of the fair market value of the timber.
The foresters agreed that timber cruising is not an exact science. The foresters involved knew one another, and each testified the other foresters were professionals. Gremillion testified that this timber had been "high graded" over the years, that is, only the most valuable trees had been removed, so the remaining trees were of lesser quality. Walter L. Stokes, an expert in forestry management and valuation, agreed that the timber had been high graded and was of less than average quality. Willis and Gremillion also testified that some of the timber would be difficult to harvest because of poor drainage in lowlying areas.
Stokes pointed out that the difference in cruise volumes results from the different interests represented by the foresters. He stated the seller is looking to sell as much timber as he can, while the buyer is looking for the kind of timber he needs to use in his mill. Willis explained that when he is cruising for a seller, he includes trees that might be questionable, while a forester cruising for a buyer would exclude them. He stated, "I'm putting down there what may be there, [but] they're putting what they believe is there and not taking a chance on what may not be usable." Gremillion further explained that he placed no value on the unmarketable species of trees, such as locust, bitter pecan, and overcup oak, while Busby valued them all.
The timber was offered to the public for bids by the majority owners, but only two bids were receivedMartco's, and one from a timber broker for approximately $1,000,000. Martco originally bid $2,100,000, but increased its offer to the majority owners' asking price when they agreed to a longer period to harvest the trees. Stokes testified that, in his opinion, the price paid by Martco was fair and reasonable.
Before we can determine whether the trial court erred in finding that the price Martco paid was not lesionary, we must address two evidentiary issues raised in a motion filed by plaintiffs and in plaintiffs' supplemental brief.
1) Should we consider the portions of Martco's briefs regarding the court-ordered logging and Exhibits D-26 through D-32?
The trial judge was in a quandary over the disparity in the volumes calculated by the foresters. He asked the parties if a small tract remained that had not yet been cut and learned that a 40-acre tract remained. This tract had been cruised by Willis, Gremillion, and Busby. At the conclusion of the trial, he directed the parties to have the 40-acre tract cut and report the number of trees harvested so he could determine which forester's estimate was more accurate.[9] This court-ordered harvesting was done, and on March 31, 2000, plaintiffs filed a motion to introduce exhibits P-40a through P-40e, which include photographs of the tract after the harvest and a comparison of the volume count and the estimates. On April 3, 2000, Martco filed a motion to introduce exhibits D-26 through D-32, showing the results of the harvest. Plaintiffs moved to strike the audio portion of exhibit D-26 but did not object to Martco's other exhibits. The trial court never issued a formal ruling on these exhibits but rendered judgment on September 28, 2000.
Although plaintiffs argue to the contrary, in our opinion the figures from the court-ordered logging, as shown in Martco's *593 exhibits, support Martco's forester's (Gremillion's) figures. After Martco's appellate brief was filed, plaintiffs filed a motion in this court to disregard the portions of Martco's brief that refer to the court-ordered logging. Four days later, Martco filed a motion in the trial court to supplement the record with the missing exhibits. At the trial court hearing on the motion to supplement the record, the trial court stated, "I went out and I saw this. I saw exactly what y'all are showing me right here [in the photographs]." The trial court then ordered the record supplemented with both Martco's exhibits D-26 through D-32 and plaintiffs' exhibits P-40a through P-40e. The district court clerk of court duly transmitted those exhibits to this court. The supplementation of the record rendered moot the portion of plaintiffs' motion asking us to disregard the statements in Martco's brief regarding those exhibits, and thus that portion of the motion will be denied.
2) Did the trial court err in permitting the record to be supplemented with exhibits D-26 through D-32?
After the trial court ordered that the record be supplemented, plaintiffs filed a supplemental brief adding an additional assignment of errorthat the trial court erred in allowing exhibits D-26 through D-32 to be introduced. LSA-C.C.P. art. 2132 provides that a record on appeal that omits a material part of the trial record may be corrected even after the record is transmitted to the appellate court. The parties do not dispute that this evidence was provided to the trial court before judgment was rendered; the trial court stated that "this is something that got by me in my office." Based on these facts, we find no abuse of discretion by the trial court in ordering the record supplemented with exhibits that Martco attempted to file before the judgment was rendered, but which were inadvertently misplaced in the district court.
Having disposed of these evidentiary matters, we now return to the issue of whether the trial court committed manifest error in finding the price paid by Martco was not less than 50% of fair market value. The trial court heard the testimony of four experts in timber valuation. Of those four, only Busby thought the price paid by Martco was less than 50% of fair market value. The trial court heard the experts, went to the scene of the court-ordered logging where he observed the timber himself, and rendered a decision that the price was not lesionary.
A court of appeal may not set aside the trial court's factual findings in the absence of manifest error. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
When findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact's findings, for only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, 549 So.2d at 844. The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990). The trial court has great discretion in assessing the credibility of expert witnesses and accepting or rejecting their opinions. LSA-C.E. art. 702; *594 Annina v. Eschette, XXXX-XXXX, p. 4 (La. App. 1st Cir.11/21/01), 814 So.2d 13, writ denied, XXXX-XXXX (La.3/8/02), 811 So.2d 880.
In this case, the trial court obviously chose to reject Busby's testimony regarding the value of the timber and to accept the testimony of Willis, Gremillion, and Stokes. We find no manifest error in the trial court's decision that the price paid by Martco was not less than 50% of the fair market value and thus was not lesionary.

DID MARTCO COMPLY WITH THE REQUIREMENTS OF LSA-R.S. 3:4278.2?
Louisiana Revised Statute 3:4278.2B requires a buyer who purchases timber from consenting and non-consenting co-owners to make a reasonable effort to contact the non-consenting co-owners and to offer to contract with them on "substantially the same basis" that he has contracted with the consenting co-owners. The trial court found that Martco had complied fully with the provisions of the statute and offered each co-owner the exact same terms and conditions.
The two contracts have the same price, term, and conditions. Martco acknowledges there were small differences in the two contracts but contends those differences are inconsequential. Plaintiffs, however, contend those differences are substantial and render the contract null. The two differences are: 1) the payment to the majority owners was split into two payments, one on December 30, 1993, and the other on January 3, 1994, while the minority owners were paid in a lump sum; and 2) the legal descriptions of two of the seventeen tracts were changed so that the majority owners sold two tracts of 801 and 1,699 acres, while the plaintiffs sold four tracts of 701, 100, 865, and 834 acres.[10]
David Lawrence Mitchell, Martco's head forester for the hardwood area, testified he contacted the plaintiffs in September or October of 1993, several months before the act of sale was entered into with the majority owners. He stated he split the payment for the majority owners into two tax years because they requested it and would have done the same for plaintiffs had they asked. He explained that the property descriptions were different, although the total acreage remained the same, because between the sale by the majority owners and the sale by plaintiffs, some interfamilial donations were made, necessitating the change.
Based on the evidence, we agree with Martco's contentions that these differences were inconsequential. The trial court did not commit manifest error in finding that Martco offered the same terms and conditions to the plaintiffs as to the majority owners and that Martco complied fully with the provisions of LSA-R.S. 3:4278.2.

CONSTITUTIONAL CLAIMS
Motion to disregard portions of Martco's brief
In its appellate brief, Martco quotes from an opinion by Judge Marionneaux rendered in the Eighteenth Judicial District Court in another case and from a brief filed by the Louisiana Attorney General's office in that case. Both of those documents addressed the constitutionality of LSA-R.S. 3:4278.2 and were filed in the *595 trial court record as attachments to Martco's motion for summary judgment on the constitutional issue. Plaintiffs filed a motion that, in part, asks that we disregard that portion of Martco's brief. We hereby grant that portion of the motion. These documents are not within the legal matters of which we can take judicial notice under the Louisiana Code of Evidence. See LSA-C.E. art. 202. We shall therefore disregard that portion of Martco's brief and decide this issue without reference to those documents.
Merits of the constitutional claims
Plaintiffs contend that LSA-R.S. 3:4278.2 violates Article I, Sections 2 and 4 of the Louisiana Constitution and the Fourteenth Amendment of the United States Constitution. The Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Louisiana Constitution guarantee freedom from the deprivation of life, liberty, or property without due process of law. The crux of the Due Process Clause is protection from arbitrary and unreasonable action. City of New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).
When reviewing a state statute that is alleged to be unconstitutional, the court must presume the statute is constitutional, and where possible, the court should give such laws an interpretation of constitutionality. Moore v. RLCC Technologies, Inc., 95-2621, pp. 7-8 (La.2/28/96), 668 So.2d 1135, 1140. The party attacking the statute has the burden of establishing by clear and convincing evidence that the statute is unconstitutional. State v. Atterberry, 95-0391, p. 13 (La.App. 1st Cir.11/9/95), 664 So.2d 1216, 1224.
With respect to the Due Process Clause, the United States Supreme Court has stated that the "judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." City of New Orleans, 427 U.S. at 303, 96 S.Ct. at 2517. A state is free to enact laws to protect against what are found to be injurious practices in its internal commercial and business affairs, so long as the laws do not run afoul of some specific federal constitutional prohibition or some valid federal law. Ferguson v. Skrupa, 372 U.S. 726, 730-31, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963). When a statute does not affect fundamental rights, but is merely an economic or social regulation, it passes constitutional muster if it has a rational relationship to a legitimate government interest. Med Exp. Ambulance Serv. v. Evangeline Parish Police Jury, 96-0543, p. 7 (La.11/25/96), 684 So.2d 359, 365.
The trial court held that LSA-R.S. 3:4278.2 bears a rational relationship to the legitimate state interest of the conservation and use of forest resources in the State of Louisiana and is therefore constitutional. The trial court, however, did not address whether the statute complied with procedural due process as well as substantive due process.
With a substantive due process review, a court looks only at whether a particular legislative measure was a rational way to correct a problem. For legislation involving economic and social welfare interests, as opposed to fundamental rights, the test of substantive due process is whether the regulation is rational in relation to the goal sought to be attained and is adopted in the interest of the community as a whole. Fields v. State through Dept. of Public Safety & Corrections, 98-0611, p. 6 n. 2 (La.7/8/98), 714 So.2d 1244, 1250 n. 2; see also Standard *596 Materials, Inc. v. City of Slidell, 96-0684 (La.App. 1st Cir.9/23/97), 700 So.2d 975.
When the aggrieved party is claiming a fundamental, constitutionally protected right, such as a liberty or property right, however, the protections of procedural due process are also implicated. In re Carline Tank Servs., Inc., 627 So.2d 669 (La.App. 1st Cir.1993). Clearly, the rights affected in this case, being the rights inherent in ownership of immovable property, are afforded such protection.
An essential requirement in any due process challenge is that the claimant must show that some property or liberty interest has been adversely affected by state action. Price v. U-Haul Co., 98-1959, p. 3 (La.9/8/99), 745 So.2d 593, 594. A primary factor in determining the existence of state action, when the asserted involvement is a legislative act, is whether the act codified or extended previous rights. Price, 745 So.2d at 599. Before the enactment of LSA-R.S. 3:4278.2, there was no right to remove timber from a person's property without that person's consent. The procedure authorized by the statute is tantamount to a "quick-taking" of privately-owned immovable property by private parties for private purposes, with no prior notice and no opportunity for a meaningful hearing. This statute establishes an unprecedented mechanism whereby privately owned immovable property can be transferred without the consent of the owner. As there is no other source of this right, the enactment of the statute suffices as state action, for purposes of the due process analysis.
Persons whose constitutionally protected rights may be affected by state action are entitled to be heard at a meaningful time and in a meaningful manner, and in order that they may enjoy that right, they must first be notified. Fields, 714 So.2d at 1250; Bays v. Bays, XXXX-XXXX, p. 4 (La.2/21/01), 779 So.2d 754, 757. Under the statutory scheme and the facts of this case, the non-consenting owners are given no notice that their timber is being cruised and offered for sale until after 80% of their co-owners have confected the buy-sell agreement. At that point, the sale can and will proceed without their participation or consent. Therefore, such notice is totally ineffectual. It does not allow them to take part in any negotiations regarding the price, the terms of the sale, or any of the other choices that may affect the valuation of the standing timber sold and the value of their immovable property once the timber has been removed.
The majority owners in this case argue that procedural due process is satisfied by the availability of a lawsuit for injunctive relief or damages. However, if, as they contend, the statute is constitutional, neither damages nor injunctive relief would be available unless the procedures set forth in the statute were violated. See Brinker v. Junction City Wood Co., 28,914, pp. 8-9 (La.App.2d Cir.6/16/99), 744 So.2d 657, 662-63. Therefore, by complying with the statute, the majority owners could always foreclose any meaningful challenge to their decision to sell timber belonging to someone else. The statute itself sets up a circularity that operates to defeat the procedural due process protections of Article I, Sections 2 and 4 of the Louisiana Constitution and the Fourteenth Amendment of the United States Constitution. We must therefore declare LSA-R.S. 3:4278.2 to be unconstitutional. Because we find this statute fails to provide the procedural due process protection guaranteed by the state and federal constitutions, we need not address whether it passes constitutional muster as to substantive due process.

DAMAGES
We must now proceed to impose damages. Plaintiffs contend they are *597 entitled to treble the fair market value of the trees removed under LSA-R.S. 3:4278.1C. That statute provides for penalties of three times the fair market value against one who, in good faith, cuts another's timber without consent, "if circumstances prove that the violator should have been aware that his actions were without the consent or direction of the owner or legal possessor of the trees." Jurisprudence has interpreted LSA-R.S. 3:4278.1, informally known as the "tree piracy law," to apply to those who flagrantly disregard the property rights of timber owners. Bulliard v. Delahoussaye, 481 So.2d 747, 754 (La.App. 3d Cir.1985). Subsection C is principally aimed at tree pirates who cut timber or remove timber. The punitive nature of this part penalizes a person's actions for their own pecuniary gain who otherwise would only pay a landowner or legal possessor the value of the trees taken. With Subsection C in force, such a trespasser is dissuaded from taking another's timber for his own gain because he will no longer break even when he is caught. Jordan v. Stevens Forestry Servs., Inc., 430 So.2d XXX-XXX-XX (La. App. 3d Cir.1983). This penal statute must be strictly construed. Williams v. Indus. Helicopters, Inc., 519 So.2d 1180, 1185 (La.App. 3d Cir.1988); Jordan, 430 So.2d at 808.
In this case, Martco was acting pursuant to a statute that was presumed constitutional. It had a contract signed by 82.5% of the property owners and had deposited funds into the registry of the court to pay the other 17.5% of the owners pursuant to LSA-R.S. 3:4278.2D. It was not acting as a tree pirate; indeed, it had no reason to believe it did not have at least the legally implied consent of all of the timber owners. Thus, we find no merit in plaintiffs' claim for treble damages.
Plaintiffs were clearly entitled to receive their proportionate share of the fair market value of their timber,[11] but that has already been paid by Martco through the deposit into the registry of the court, which plaintiffs withdrew. While damages for loss of aesthetic value,[12] reforestation cost,[13] and mental anguish[14] are justified for the loss of timber under certain circumstances, we do not find those circumstances here. Plaintiffs have not alleged they attached any sentimental value to this timber, nor have they alleged they would not have had it cut themselves. What plaintiffs lost by the lack of procedural due process was the right to determine the timing and conditions of the sale of their timber. Plaintiffs' representatives testified that had they been given notice of the sale or any control over the terms and conditions of the sale, they would have negotiated for a different technical agent, a higher price, and the right to be paid over two tax years. They might also have preferred that the timber be sold in smaller groups of tracts, rather than all 18 tracts at once.
Although the value of an incorporeal[15] right is always difficult to ascertain, we *598 find that the sum of $218,295.20 (one-half the fair market value of their share of the timber) would adequately compensate them for the loss of the right to determine the timing and conditions of the sale of their timber.

CONCLUSION
For the foregoing reasons, plaintiffs' motion to disregard the portion of Martco's brief that refers to exhibits D-26 through D-32 is denied as moot; the portion of that motion to disregard references to Judge Marionneaux's opinion and the Attorney General's brief is granted; and the judgment of the trial court is reversed. We hereby render judgment declaring LSA-R.S. 3:4278.2 unconstitutional. We further render judgment in favor of plaintiffs and against Martco in the sum of $218,295.20, plus legal interest thereon from date of judicial demand until paid. Martco is cast with all costs of these proceedings.
MOTION DENIED IN PART AND GRANTED IN PART; REVERSED AND RENDERED.
PARRO, J., specially concurring.
I agree with the majority report and specially concur with respect to the imposition of statutory damages. I agree that such damages were not available under LSA-R.S. 3:4278.1, but only because there was no violation of Subsection A of the statute. Subsection A states, in pertinent part:
It shall be unlawful for any person to cut, fell, destroy, remove, or to divert for sale or use, any trees ... growing or lying on the land of another, without the consent of, or in accordance with the direction of, the owner or legal possessor, or in accordance with specific terms of a legal contract or agreement. (Emphasis added).
In this case, Martco was operating pursuant to the specific terms of a legal contract or agreement when it harvested the timber. The penalty provisions of the statute are only applicable to those who violate the provisions of Subsection A. See LSA-R.S. 3:4278.1(B), (C), and (D). Since Martco did not violate the provisions of Subsection A, the statutory treble damages are inapplicable.
Therefore, I respectfully concur.
NOTES
[1] Hon. Ian W. Claiborne, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Named as plaintiffs are Frank Baist Allain, Earl Anthony Allain, Patricia Bryant, Joseph Baist Dupont, Sr., Betty Jane Dupont Hebert, Emma Jo Dupont Williamson, James Harry Dupont, William Christopher Dupont, Doris Ann Allain Pettus, Tal Dupont, Ty Dupont, Tate Dupont, and Trevor Dupont.
[3] All references to LSA-R.S. 3:4278.2 in this opinion are to the version prior to its amendment by 2001 La. Acts, No. 558, § 2.
[4] Although plaintiffs never specifically pleaded lesion beyond moiety in their petition, they do allege that the consideration was so inadequate that it would result in unjust enrichment to defendant. Under our system of fact pleading, plaintiffs are not required to allege a theory of recovery. Royal Furniture Co. v. Benton, 260 La. 527, 532, 256 So.2d 614, 616 (1972). The allegations of the petition are sufficient to put the defendants on notice of a claim for lesion. Cf. Sunseri v. Sunseri, 480 So.2d 1003, 1005 (La.App. 4th Cir.1985).
[5] The majority owners are not parties to this lawsuit. Under LSA-C.C. art. 2600, if more than one seller concurred in the sale of an immovable owned by them in indivision, or if each of them separately sold his share, each seller may bring an action for lesion for his share.
[6] The original agreement was to sell 9,857 acres of timber for $2,500,000, but before the contract of sale was executed, the parties discovered that one of the tracts included in the 9,857 acres had been cut ten years earlier and for silvicultural purposes did not need to be re-cut. That tract was deleted from the final sale, and the purchase price was adjusted accordingly.
[7] Article 2589 was enacted by 1993 La. Acts, No. 841, § 1, effective January 1, 1995. According to the revision comments, it combined the substance of Articles 2589, 2593, and 2594 of the Louisiana Civil Code of 1870, but did not change the law.
[8] "Stumpage" is determined by calculating the delivery price for the timber, that is, the price the mill would pay to a logger, and by deducting from the delivery price the expenses that would be incurred by the logger in harvesting and transporting that timber.
[9] Neither party objected to this procedure; in fact, the attorneys for both parties were enthusiastic in their support of this fact-finding endeavor.
[10] Plaintiffs also complain about one aspect of the contract that was the same for both, that they wanted to be differentthe designation of the Willis and Taylor consulting firm as technical agent when they would have preferred Joseph Dupont. Since the same agent is named in both contracts, this cannot be a ground for annulling the sale due to noncompliance with LSA-R.S. 3:4278.2.
[11] See Brown v. Bedsole, 447 So.2d 1177 (La. App. 3d Cir.), writ denied, 450 So.2d 358 (La.1984).
[12] See Howes v. Rocquin, 457 So.2d 1220, 1223 (La.App. 1st Cir.1984).
[13] See Isdale v. Carman, 96-1435, pp. 16-17 (La.App. 3d Cir.4/2/97), 692 So.2d 687, 694-95.
[14] See Harkness v. Porter, 521 So.2d 832 (La. App. 2d Cir.), writ denied, 523 So.2d 1323 (La.1988).
[15] Under Roman law, "[i]ncorporeal things were abstract conceptions, objects having no physical existence but having a pecuniary value. The illustrations given were rights of various kinds...." A.N. Yiannopoulos, Louisiana Civil Law Treatise, Property § 25 (3d ed.1991).